## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**LEON WEINGRAD,** individually and on
behalf of all others similarly situated,

       *Plaintiff,*

*v.*

**EXACT CARE PHARMACY, LLC**

       *Defendant.*

Case No.

2:25-cv-1843

**Plaintiff's Response in Opposition**
**<u>To Exact Care Pharmacy, LLC's Motion to Bifurcate Discovery</u>**

## I.    INTRODUCTION

The Court should deny Defendant's motion to bifurcate discovery in all respects because bifurcating the discovery in this case will be inefficient and prejudicial, particularly as Defendant has submitted recordings that, according to a forensic review, contain "strong indicators of manipulation, and cannot be considered reliable representations of unaltered, original recordings"[1] in support of its motion, thus placing classwide issues of the legitimacy of the purported consent it obtained at issue and rendering bifurcation inappropriate.

## II.    ARGUMENT

District courts have broad discretion to control discovery. *Crawford—El v. Britton*, 523 U.S. 574, 598-99 (1998). Requests to bifurcate discovery are controlled by Rule 42(b). *SenoRx, Inc. v. Hologic, Inc.*, 920 F. Supp. 2d 565, 568 (D. Del. 2013). The Third Circuit has "condemned the district court's practice of bifurcating [discovery] as a general rule." *Barr Lab., Inc. v. Abbott Lab.*, 978 F.2d 98, 115 (3d Cir. 1992). "Bifurcation is the exception and the moving party bears the burden of demonstrating that bifurcation is needed… As a practical matter, bifurcation of discovery…is extremely rare, since bifurcation often delays cases and leads to serial motion practice." *Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 2016 WL 4541870, at *2 (D.N.J. Aug. 31, 2016).

## I.    <u>Bifurcation of Discovery will be Inefficient and Unfair</u>

Bifurcation of discovery is often "counterproductive." Manual For Complex Litigation (Fourth) ("MCL 4th") § 21.15 (2015). That is readily apparent here, especially because the Defendant seeks to identify its preferred defenses, namely consent (which it admits is in another individual's name) and related standing. However, Exact Care doesn't proffer that it obtained the

---

[1] *See* <u>Exhibit 1</u>, Forensic Report of IGI Forensic Lab.

Plaintiff's consent in any way that is materially different than the purported consent for the other putative class members, particularly insofar as it relies on documents which are obvious forgeries for this contention. The proposed bifurcation guarantees that the parties will need to duplicate their work. First, the parties would undertake "individual merits" discovery and all that entails: written discovery requests, depositions, and then expert disclosures and expert depositions, all limited just to the individual claim of the Plaintiff, all based on demonstrably forged evidence. Then, Defendant would file a dispositive motion to Plaintiff's *individual claims*. And then, should the Court deny that motion, the parties have to start all over again, serving discovery requests and taking depositions of the same witnesses a *second time*, but this time focusing on *class certification* issues, as well as the remaining issues on the Plaintiff's individual claim. All told, this means at least *two rounds* of written discovery relating, respectively, to individual liability, class certification, and class liability, *two rounds* of depositions (with the same witnesses being deposed at least twice), and then *two rounds* of summary judgment briefing. This is the opposite of judicial economy. Indeed, as Pennsylvania federal courts have observed in similar class action cases, "bifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions." *Hartley-Culp v. Credit Mgmt. Co.*, No. 3:CV-14-0282, 2014 WL 4630852, at *4 (M.D. Pa. Sept. 15, 2014).

The Court should deny Defendant's motion to bifurcate for this reason *alone*. *See id.* (denying similar motion to bifurcate merits and class discovery in a TCPA case); *EQT Prod. Co. v. Terra Servs., LLC*, No. CV 14-1053, 2014 WL 12838677, at *1 (W.D. Pa. Oct. 22, 2014) ("Terra's proposal would likely result in deposing the same witnesses twice—once in the liability phase, and again in the damages phase. This is the definition of inconvenience, and the

additional cost of duplicative depositions and document review combine to counsel against

bifurcation in this case."). The request by the Defendant to limit discovery initially to its

preferred issues is "untenable and unfair." *Wilson v. Quest Diagnostics, Inc.*, 2019 U.S. Dist.

LEXIS 224798, *9 (D. N.J. August 22, 2019) (denying virtually identical request to bifurcate in

a TCPA case). "The Court should not allow one side to pick one defense of its choosing, limit

discovery to that issue, and then presumably try a summary judgment motion. Both sides have a

right to discovery." *Id.*

## II.    The Bifurcation of Discovery Requested Here is Premised on Recordings that have been Manipulated and are Critically Inaccurate. The Plaintiff provides the Complete Recordings in Response to the Motion. Furthermore, the Phone Company for One of the Numbers has Ignored the Plaintiff's Subpoena.

Apart from the duplication of discovery outlined above, Defendant's proposal is bound to

lead to additional discovery disputes and proceedings that would be completely unnecessary

without bifurcation, and, indeed, which lend themselves to classwide resolution. At least one

such dispute has already arisen: the Plaintiff's non-consent to the communications at issue and

the Defendant's demonstrable presentation of apparently forged recordings to this Court which

were presented in an effort to demonstrate that the Plaintiff consented. *See* Exhibit 1.

As an initial matter, as the Plaintiff's Complaint makes clear, the Plaintiff received a call

from ExactCare on November 27, 2024, a copy of the recording of the same is attached herein as

Exhibit 2.[2] During that call, the Plaintiff was told that the agent could not proceed and thanked

him for his time before the agent terminated the call. The Plaintiff also received a call on

December 7, 2024, which was missed, but came from the *same caller* ID as a call on February

---

[2] The format of the recordings Plaintiff has provided is playable in the free software VLC Media Player. For the convenience of the Court, Plaintiff's counsel has also converted the recordings to .MP3 format.

28, a call of which the Plaintiff has a recording and has produced herein as <u>Exhibit 3</u>. These two calls predate the date of the purported consent, December 12, 2024, proffered by the Defendant. Thus, the Plaintiff has demonstrably received at least two calls which predate any purported consent proffered by the Defendant and which, correspondingly, were made without consent. Of course, discovery should not be bifurcated to address a purported consent that occurred *after* a sufficient amount of violative calls which violated the TCPA.

This is not to mention the fact that the Defendant has presented recordings to the Court that have been evaluated to be forged and which do not match the Plaintiff's own recordings. *See* <u>Exhibit 1</u>. The first such call, which was received at 09:45:54 AM CST on February 27 lasted 11 minutes and 39 seconds, as reflected by the Plaintiff's telephone records attached herein as <u>Exhibit 4</u>. This duration is entirely consistent with the Plaintiff's own recording, attached herein as <u>Exhibit 5</u>, which lasts the exact same time. But this duration is inconsistent with the recording presented by the Defendant, "2-27-2025 Health Care Benefits Outbound Call," purportedly of the same call, which lasts only 5 minutes and 10 seconds.

This discrepancy is critical because the altered recording omits critical elements and facts pertinent to the Plaintiff's non-consent, *including the representative coaching the Plaintiff* that he needs to be taking either five or seven medications, omits discussions of the Plaintiff's insurance, and includes a *full second conversation* with "Diane from Exact Care Pharmacy," wherein Diane states that Exact Care does not accept the Plaintiff's insurance plan and would only follow up if they started accepting it. The recording is also notable in that the forged recording seems to imply that the agent can somehow know what medications the Plaintiff is on; while the real recording reflects that the only reason the agent knew those facts was because the Plaintiff offered information about the same on the call to identify the caller and for no other

reason. These facts are critical, because, on the Plaintiff's recording of the call, as well as his Declaration, he would have no reason to and did not expect to receive future calls from Exact Care based on the agent's own representations, which is why he did not explicitly ask for the calls to cease at the conclusion of the call once the Plaintiff identified them.

The second call Plaintiff received that same day fares even worse for Exact Care's motion. This call, from 503-404-6898 at 11:43:42 AM CST, lasted 13 minutes and 41 seconds, as confirmed through the Plaintiff's telephone records and further confirmed through the exact duration of the Plaintiff's recording, attached as Exhibit 6. But the two, split-up recordings of this call, even if combined, last only 12 minutes and 54 seconds, almost a full minute shorter than the Plaintiff's recording. What has been cut from the recording is damning for Exact Care and further dooms Exact Care's assertions of purported consent. Notably, the recording presented by Exact Care has been cut to remove the representative *coaching the Plaintiff* to commit what is arguably Medicare fraud by coaching the Plaintiff, twice, to say, "so you have to say you have Medicaid," and the Plaintiff instead saying that he has Medicare RX with Aetna. If anyone is not being credible in this litigation, it is Exact Care, not the Plaintiff.

Furthermore, the recording also reflects the Plaintiff terminating the call once he identified the caller who was calling him illegally and *explicitly disinviting future calls* by saying, "Hey, can I give you a shout right back? Somebody's banging on my door. Let me call you right back. I have your number here. I'll call you." At no part of that call did the Plaintiff say for Exact Care to call him back; to the contrary, Plaintiff stated that he would call Exact Care. Despite that, the Plaintiff continued to receive calls, Exhibits 3 and 7 through 9, respectively, including the following day on February 28, which he hung up on, a call on March 6 in which Plaintiff stated that he would call Exact Care back if he was interested, and culminating in two

calls on March 6 and 7, the latter of which the Plaintiff made clear in no uncertain terms that the calls were unwanted, saying, "Yeah, listen, let me give you a shout back, because I'm at work, and you guys are calling me like every day. You guys can stop doing that. I appreciate it."

Exact Care's bifurcation argument is premised on recordings that, at best, are incomplete and, more likely, have simply been altered to paint a picture of consent and distract from Exact Care's own misconduct. This Court should not reward Exact Care with an artificial limitation on discovery based on these faulty and forged recordings. Indeed, the Plaintiff issued a subpoena to the third party telephone company who was responsible for one of the numbers at issue, 503-755-6487, Current Calls LLC, and never received a response.

### III.    The Overlap of Merits and Class Certification Questions in TCPA Cases (including this one) Makes Bifurcation of Discovery Ineffective.

There is significant overlap between discovery relevant to the merits of Plaintiff's individual claims and issues of class certification, especially given that the Defendant's proffered rationale for the proposed bifurcation, the Plaintiff's alleged consent, are belied by the actual recordings of the call and the fact that Exact Care has produced forged recordings, purportedly of the calls at issue, to the Court. Indeed, "[class certification] analysis will frequently entail overlap with the merits of the plaintiff's underlying claim . . . because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (internal citations and quotations omitted); *Charvat v. Plymouth Rock Energy, LLC*, No. 15CV4106JMASIL, 2016 WL 207677, at *2 (E.D.N.Y. Jan. 12, 2016) (denying motion to bifurcate merits and class discovery in TCPA action and explaining that "bifurcation would have the opposite effect [of "promot[ing] judicial efficiency or a prompt resolution of the case"].");

Notes of Advisory Committee on 2003 Amendments to Fed. R. Civ. P. 23(c)(1)(A) ("Active

judicial supervision may be required" to avoid "an artificial and ultimately wasteful decision

between 'certification discovery' and 'merits discovery.'"). As another Court ruled when

denying a motion to bifurcate in a TCPA case:

> The Court has reviewed the parties' joint status report. The Court does not see a
> need to bifurcate discovery in this case. There will be some overlap in discovery
> here. Discovery as to commonality and typicality under Rule 23 will also apply to
> the merits of the claim. Moreover, the Supreme Court in *Walmart v Dukes* has said
> the district court must conduct a rigorous analysis in determining class certification
> and that will often require some evaluation about facts that go to the merits of a
> plaintiff's underlying claims. Thus, bifurcating discovery often does not make
> sense as the lines between "class discovery" and "merits discovery" are
> significantly blurred.

*Katz v. Allied First Bank, SB*, No. 22-cv-5277, ECF No. 14 (N.D. Ill. Jan. 3, 2023).

Other courts have agreed. *See, e.g.*, *Grippo v. Sugared + Bronzed, LLC*, No. SA CV 24-

01792-AB (DFMX), 2025 WL 596095, at *2 (C.D. Cal. Feb. 24, 2025) (relying on several

TCPA cases in rejecting a bifurcation of discovery holding, "the distinction between merits

discovery and class discovery is not always clear, and many courts are, for this reason, reluctant

to bifurcate class and merits discovery."); *Blair v. Assurance IQ LLC*, No. 23-16, 2023 WL

6622415, at *6 (W.D. Wash. Oct. 11, 2023); *Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. 15-

2057, 2018 WL 501413, at *3 (C.D. Cal. Jan. 5, 2018) ("[T]he distinction between class

certification and merits discovery is murky at best and impossible to determine at worst."). As

another federal court held earlier this year while rejecting bifurcated discovery in yet another

TCPA case, "Because individual and class discovery overlaps, the difficulty of drawing the line

between the two is likely to cause further discovery disputes and place greater demands on the

Court's time. This result also implicates the third factor, judicial economy, and weighs

against bifurcation." *Nock v. PalmCo Admin., LLC*, No. 24-CV-00662-RDB, 2025 WL 100894, at *3 (D. Md. Jan. 15, 2025).

Not only that, but Exact Care in its motion couches its motion to bifurcate on the contention that it is not liable for any of the alleged phone calls made to the Plaintiff, including because of disputed consent issues. That simply does not follow. A defendant is not entitled to escape discovery in this or any other case simply because they deny liability. But *even if* it is the case that Exact Care cannot be liable for the conduct here, that denial of liability would be just as easily proven in discovery with respect to the class claims as the individual ones, particularly inasmuch as it pertains to class certification issues. In other words, if the distinction as to liability in general is clear and not murky, class discovery would impose no additional burden on the Defendant. However, if the Defendant is liable, bifurcation of discovery will lead to needless waste of judicial resources, discovery disputes, and needlessly duplicated effort.

Indeed, even the Northern District of Texas, a district known for trying cases with alacrity, has remarked in another TCPA case denying a similar bifurcation motion and rejecting a substantially similar bifurcation request from a TCPA defendant highlighting the signification overlap between merits and class certification discovery in a TCPA case while providing an overview of relevant binding Supreme Court and other case law:

> As to class certification under Rule 23, the Supreme Court has instructed that "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

> And "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim" because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (cleaned up).

8

Considering *Dukes* and the "rigorous analysis" requirement for class certification, district courts have been reluctant to bifurcate class-related discovery from discovery on the merits. *See Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. EDCV152057FMOSPX, 2018 U.S. Dist. LEXIS 2286, 2018 WL 501413 (C.D. Cal. Jan. 5, 2018) (declining to bifurcate discovery in TCPA case and stating that "the distinction between class certification and merits discovery is murky at best and impossible to determine at worst"); *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y. 2012) (collecting cases).

In another TCPA case, *Cardenas v. Resort Sales by Spinnaker, Inc.*, No. 9:20-cv-00376-RMG, 2021 U.S. Dist. LEXIS 34923, 2021 WL 733393 (D.S.C. Feb. 24, 2021), the Court found that bifurcation would not serve the interests of judicial economy given the plaintiff's "persuasive argument that the evidence needed to determine whether [they] have a claim substantially overlaps with [their] ability to represent a class under [Rule] 23." *Cardenas*, 2021 U.S. Dist. LEXIS 34923, 2021 WL 733393, at *3.

Similarly, here, the undersigned already found that Folsom "may not avoid appropriate classwide discovery that is — as Bond persuasively argues — necessary for a future class certification motion." Dkt. No. 28. And, so, the Court agrees with Bond that bifurcation would not promote efficiency because there is considerable overlap between discovery relevant to the merits of his individual claims and issues of class certification. *Accord True Health Chiropractic, Inc. v. McKesson Corp.*, 2015 WL 273188, *2-3 (N.D. Cal. 2015) (declining to bifurcate a TCPA class action and noting that individual and class discovery claims typically overlap).

And, in light of the bulk of authority discussing the lack of a "bright line" distinction between merits and class discovery, bifurcation could lead to avoidable, future disputes over whether a particular discovery request relates to the merits or to class certification. *See Quinn v. Specialized Loan Servs., LLC*, 321 F.R.D. 324, 327-28 (N.D. Ill. 2017); *see also City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.*, 2015 U.S. Dist. LEXIS 79392, 2015 WL 11120408, *1-2 (W.D. Ark. 2015) (bifurcation may force the court to resolve "endless discovery disputes"); *True Health*, 2015 U.S. Dist. LEXIS 7015, 2015 WL 273188, at *3 (finding that bifurcation "raise[s] a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs, thereby causing additional litigation regarding the distinction between the two.").

And, so, considering the binding law from *Dukes* and persuasive authority from other district courts, the Court declines to bifurcate discovery in this case.

*Bond v. Folsom Ins. Agency LLC*, No. 3:24-CV-2551-L-BN, 2025 WL 863469, at *2-3 (N.D. Tex.

Mar. 19, 2025).

Given this overlap, bifurcation would "belie principles of judicial economy, as the Court may be forced to spend time and resources resolving discovery disputes over what is 'merit' discovery as compared to 'class' discovery." *In re Plastics Additives Antitrust Litig.*, No. CIV.A. 03-2038, 2004 WL 2743591, at *3 (E.D. Pa. Nov. 29, 2004). There also has been no showing here by Defendant that it has any *unique* defenses regarding purported consent to the Plaintiff's claim that don't also apply to the other individuals that were contacted with telemarketing calls.

**IV.    The Defendant Seeks to Bifurcate Discovery Relating to Purported Consent, but Consent is Irrelevant to One of Plaintiff's Claims.**

Moreover, the issue of consent is *irrelevant* to the Plaintiff's caller ID claims, rendering bifurcation as to the issues of consent irrelevant to those claims. Unlike the Plaintiff's TCPA Do Not Call Registry claims, which explicitly mention consent as an affirmative defense, 47 C.F.R. § 64.1200(c)(2)(ii) (exempting calls made with "prior express invitation or permission), the Plaintiff's caller ID claims do not have any consent exemption. 47 C.F.R. § 64.1601(e). Indeed, the language of the applicable regulation introduces an express *prohibition* and *requirement* untethered to consent, with the only exemption being that "[t]ax-exempt nonprofit organizations are not required to comply with this paragraph." *Id.* Nowhere in the regulation is consent, invitation, or permission mentioned, and for good reason. It is axiomatic that one cannot provide their consent to conduct which is clearly illegal. Simply put, given that consent is not a defense to this claim, this renders the Defendant's bifurcation proposal all the more unwieldy and unmanageable as the Plaintiff can, and should, be permitted to seek class discovery now as to those claims, as there are no issues to bifurcate discovery on such claims.

In this regard, Defendant's own conduct was particularly egregious as it actively *spoofed* caller IDs and transmitted demonstrably false information. And several subpoena responses,

attached herein as <u>Exhibit 10</u>, have already been obtained, demonstrating that the Defendant, or the vendor it used, in addition to forging call recordings, has engaged in the highly-illegal practice of "spoofing" caller ID numbers, including to a non-existent number and a number for United Technologies and Raytheon, a now-merged U.S. Government Defense Contractor. These facts further demonstrate that bifurcation is unnecessary, as even if, *arguendo*, the Plaintiff did consent (which he most assuredly did not), the Plaintiff still has viable claims for the provision of inaccurate caller ID name.

### V. The Plaintiff Did Not Acquire the Telephone Number for the Purpose of Bringing Lawsuits, so no Bifurcated Discovery is Needed Regarding Standing.

Mr. Weingrad has provided a declaration to accompany the recordings of telemarketing calls at issue. In that declaration, he also explains, among other salient facts:

- My telephone number 503-XXX-XXXX is on the National Do-Not-Call Registry.
- My telephone number 503-XXX-XXXX is a residential cellular telephone number.
- I am the user of 503-XXX-XXXX.
- The 503-XXX-XXXX number is registered in my name and I am the subscriber of record.
- I obtained the 503-XXX-XXXX number in July of 2024. It has been my number continually since that time.
- This number is used for personal, family, and household purposes.
- I do not know anyone named Joseph Arnold and have never met someone by that name.
- I did not give Joseph Arnold permission to provide consent on my behalf to receive calls or text messages in any manner whatsoever.
- I am sometimes confused or perplexed by the calls I received, some of which appear to be made looking for an individual named "Joseph Arnold," who I believe, but do not know for sure, was the previous person to whom my telephone number was assigned.
- As such, I sometimes receive unwanted calls for a person named "Joseph Arnold."
- I did not give Joseph Arnold permission to provide consent on my behalf to receive call or text messages in any manner whatsoever.
- Even so, identifying the origin of these callers who place unwanted and illegal calls to me is virtually impossible without engaging the callers in their telemarketing script in order to obtain their true corporate identities. Otherwise, the callers are impossible to identify and hold accountable for their actions.
- In this case, it is evident that I would not have been able to affirmatively confirm that the callers were calling from Exact Care without playing along with the script and stating that I was on Medicare, as I was instructed.

- In any event, I could not have made a do not call request in any event by calling the number back, as I stated, because the telephone numbers were forged and spoofed.
- My actions in investigating the callers who illegally call me by engaging with their telemarketing scripts does not place me in a position to invite calls or deprive me of the injury these calls inflict upon me. Rather, my engagement with the callers who call me occurs only during the course of the illegal and unsolicited calls that they place to me on their own accord, without any interaction nor intervention from me. This engagement, in turn, only allows me to identify the callers who break the law by concealing their identities.
- Any eligibility did not change and I still received calls; I was coached to lie on the calls to say I had Medicare in order to qualify.
- This engagement does not give the entities that call me consent to call me as an initial matter.
- As a general matter, once I have identified the caller calling me illegally, I will make clear that I do not wish to continue to receive calls.
- However, in this case, the first two calls I received from Exact Care in which I spoke to a representative, on November 11, 2024, and February 27, 2024, at the conclusion of each call, I was told that I was not eligible and the caller hung up.
- As a result, I did not (and could not) make a do not call request, and in any event, would not have expected or wanted to receive further calls, let alone from a company who would continue to call after stating that I was allegedly ineligible.
- To be clear, I do nothing to precipitate the illegal calls and messages which are placed to me. I do not want these communications, but they continue to be placed to me. They are highly annoying and disruptive.
- I have never proactively created or found TCPA claims nor entrapped businesses. I do not welcome nor invite these illegal calls and have taken measures for them to stop, including by placing my number on the Do-Not-Call Registry and holding those who call me accountable for their actions.
- I was harmed by the Defendant's calls and text messages. Illegal calls are frustrating, obnoxious, and annoying. They are a nuisance and disturbed my solitude.
- As a consumer protection advocate, I have filed several lawsuits alleging violations of the Telephone Consumer Protection Act.

See Exhibit 11. Such assertions doom the Defendant's basis for bifurcation. The Defendant relies on *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 788-89 (W.D. Pa. 2016) in which, at summary judgment, a TCPA plaintiff was found to lack standing where she testified her sole purpose for owning over 35 cell phones that she kept in a shoe box was to run what she referred to as a TCPA litigation business, and that these 35 cell phones were used only to collect telemarketing calls and were not called by anyone else for any other purpose. As an initial matter, it is notable that discovery in *Stoops* was not bifurcated. Defendant would have the Court

believe that *Stoops*—which predates the litany of subsequent rulings clarifying not only its

limited usefulness but also cases *specifically addressing the standing of litigants who engage in*

*legitimate investigative activity*—stands for the proposition: "no standing for repeat TCPA

litigant." Of course it doesn't. As demonstrated above, Mr. Weingrad's situation bears no

resemblance to Ms. Stoops. Mr. Weingrad isn't alleged to have collected phones for some

litigation enterprise. He simply has received unwanted phone calls and is now fighting back.

Red-herring arguments as to purported "issues" with the Plaintiff's standing should not here

stand as a basis to bifurcate discovery, either.

"[N]othing in the Constitution, though, requires a plaintiff to be a naïf. Litigation is not

college athletics: there is no 'amateurs only' rule." *Cunningham v. Rapid Response Monitoring*

*Servs.*, 251 F. Supp. 3d 1187, 1195 (M.D. Tenn. 2017). As the Court in *Cunningham* went on to

elucidate on the issue of standing in expressly rejecting the notion that a plaintiff's subjective

motivations impact their standing:

> The determinative issue, then, is not Cunningham's motivations, but whether he was
> injured. An ordinary consumer who pled the facts that Cunningham has pled would have
> established a concrete and particularized injury-in-fact based on the Defendants' intrusion
> upon his rights to privacy and seclusion. Defendants suggest that, by becoming a so-called
> "professional plaintiff," he has forfeited those rights because the calls alleged were not
> truly unwanted. Insofar as *Stoops* endorses such a result, this Court disagrees. *It may be*
> *that Cunningham was not saddened or annoyed by the calls he received; it may even be*
> *that, knowing his rights under the TCPA, he is glad the calls were placed.* But allowing
> that fact, even if true, to negate his right to privacy and seclusion would require the Court
> to embrace a line of reasoning that would ultimately undermine the rights of most, if not
> all, TCPA plaintiffs and plaintiffs in similar statutory schemes.

*Id.* at 1196 (cleaned up) (emphasis added). *See also Murray v. GMAC Mortg. Corp.*, 434 F.3d

948, 954 (7th Cir. 2006) ("What the district judge did not explain, though, is why 'professional

[plaintiff]' is a dirty word. It implies experience, if not expertise. The district judge did not cite a

single decision supporting the proposition that someone whose rights have been violated by 50

different persons may sue only a subset of the offenders."); *Abramson v. Oasis Power LLC*, No.

13

2:18-cv-00479, 2018 U.S. Dist. LEXIS 129090, at *16 (W.D. Pa. July 31, 2018) ("As other courts addressing this issue have agreed, a citizen's decision to aggressively enforce his rights under the TCPA should not negate otherwise valid privacy interests"). And as this Court explained in *Shelton v. Nat'l Gas & Elec., LLC*, No. CV 17-4063, 2019 WL 1506378, at *4 (E.D. Pa. Apr. 5, 2019) (cleaned up) (emphasis added):

> Defendant has not introduced any evidence that Plaintiff's phone is used solely for business purposes or "specifically to drum up litigation." . . . In addition, the fact that Plaintiff warns telemarketers on his website that he will sue them if they violate the TCPA does not raise an inference that he "hopes for and encourages" potential defendants, acquires phones to increase his chances of receiving calls, or is doing anything other than exercising his rights. *The fact that he "play[s] along" with telemarketing scripts to "find out who [they] really are" is not as devious as Defendant suggests. A plaintiff must know the name of the telemarketer that violated the TCPA in order to bring suit against it, and the content of the message can help prove that it was a solicitation.*

Just as this Court already remarked in *Shelton*, investigating a caller by playing along with a telemarketing script, as the Plaintiff here did, just as in *Shelton*, is simply a form of legitimate investigative activity that has no bearing on standing, let alone for why discovery ought to be bifurcated to address those issues instead of addressing them in a unified discovery period. Merely because Mr. Weingrad is able to identify those who placed calls to him illegally does not deprive him of harm or standing any more "than the purchase of a burglar alarm would indicate that the homeowner wanted her house to be broken into." *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 783 (N.D.W. Va. 2017) (denying motion for summary judgment in TCPA case related to a similar standing argument). While the Defendant is "understandably frustrated" by the fact they are being sued, he is doing "exactly what Congress intended—enforcing the law." *Id.* Congress was well aware of this possibility when it passed the TCPA, and no general rule requires plaintiffs who prove their cases to end up worse off than before the defendant injured them. Thus, courts reject such irrelevant and dangerous attacks on plaintiffs who bring

14

multiple actions and engage in investigative tactics to stop robocalls. *See Cunningham*, 251 F. Supp. 3d at 1196 (noting that most people would accept $500 or more in exchange for enduring the privacy violation of a single robocall). Like in *Cunningham*, Defendant "seem[s] to imagine a Constitution that limits the right to sue under the TCPA to those who are *ignorant* of their right to sue under the TCPA." *Id.* "The Constitution requires no such result." *Id.*

In short, the Defendant is requesting bifurcation based on a perceived standing issue that is destined to fail. However, Rule 26 provides adequate protections for any burdensome or disproportionate discovery sought. In other words, the Defendant will be free to develop whatever defenses it would like to in a manner consistent with what the facts reveal. However, limiting discovery to its preferred issues is "untenable and unfair." *Quest Diagnostics, Inc.*, 2019 U.S. Dist. LEXIS 224798 at *9 (denying similar request to bifurcate in a TCPA case). "The Court should not allow one side to pick one defense of its choosing, limit discovery to that issue, and then presumably try a summary judgment motion. Both sides have a right to discovery." *Id.*

## VI.    The Plaintiff will be Prejudiced by Bifurcation of Discovery

Finally, bifurcation would delay discovery necessary to demonstrate the class claims, it would prejudice Plaintiff and other class members by amplifying the risk that evidence will be lost or destroyed, a concern rendered all the more prominent here because of the submission of forged evidence to the Court. Indeed, in this sense, the requested relief is akin to a motion to stay, since the Defendant is seeking to avoid all class discovery for an indefinite period of time. A stay-related delay would prejudice Plaintiff and other class members by amplifying the risk that evidence will be lost or destroyed. *Saleh v. Crunch, LLC*, No. 17-62416-CIV, 2018 WL 11264884, at *2 (S.D. Fla. Feb. 28, 2018) ("a stay would prolong this matter on the Court's docket and could conceivably prejudice Plaintiff by the fading memory of any witnesses"); *Lathrop v. Uber Techs., Inc.*, No. 14-

CV-05678-JST, 2016 WL 97511, at *4 (N.D. Cal. Jan. 8, 2016) (holding that plaintiffs in putative class action may "suffer prejudice from a stay because the case would extend for an indeterminate length of time, increase the difficulty of reaching class members, and increase the risk that evidence will dissipate").

The risk to the putative class members' interests is not merely hypothetical. Multiple decisions in TCPA class action cases have turned on the destruction of records necessary to identify class members. *E.g., Levitt v. Fax.com*, No. CIV. WMN-05-949, 2007 WL 3169078, at *2 (D. Md. May 25, 2007) (denying class certification in a TCPA case because "critical information regarding the identity of those who received the facsimile transmissions" was not available); *Pasco v. Protus IP Solutions, Inc.,* 826 F. Supp. 2d 825, 831 (D. Md. 2011) (granting the defendant summary judgment for the substantially the same reason). As a result, courts regularly permit plaintiffs to commence discovery prior to a Fed. R. Civ. P. 26(f) conference related to these issues implicating non-parties in TCPA cases. There are also other prejudices not associated with calling records that the Plaintiff will face from a stay. *See Sanaah v. Howell*, No. CIVA.08CV02117REBKLM, 2009 WL 980383, at *1 (D. Colo. Apr. 9, 2009) ("with the passage of time, the memories of the parties and other witnesses may fade, witnesses may relocate or become unavailable, or documents may become lost or inadvertently destroyed."). Here, the Plaintiff is simply seeking to proceed in the ordinary course with discovery. In denying a motion to stay, another federal court considered this issue in a TCPA case:

> In addition, Orangetheory has not demonstrated irreparable injury; it notes only that it is potentially on the hook for substantial damages, given the putative nationwide class. Monetary damages, of course, do not by themselves constitute irreparable injury. Simon, on the other hand, persuasively argues that she would be injured by a stay, particularly because discovery has yet to commence, and evidence is at risk of being lost. This injury, which is both likely and irreparable, far outweighs the injury posed by a potential future judgment for money damages.

…

In the meantime, it is clear that critical evidence, including records from any third parties that Orangetheory may have contracted with for its telephone marketing, may be lost or destroyed.

*Simon v. Ultimate Fitness Grp., LLC*, No. 19 CIV. 890 (CM), 2019 WL 4382204, at *7

(S.D.N.Y. Aug. 19, 2019). By contrast, "[d]efendant has not demonstrated significant prejudice

by its simple assertion that discovery costs money." *Grippo*, 2025 WL 596095, at *2.

## **CONCLUSION**

Bifurcation is not warranted here. As such, the Plaintiff requests that the Defendant's

motion be denied.

Date: July 8, 2025

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com

## **CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on July 8, 2025, which will automatically send

a copy to all attorneys of record on the case.

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com

17